956 P.2d 511

In the Matter of the APPEAL IN MAR-
ICOPA COUNTY JUVENILE AC-
TION NO. JD–6123.

No. 1 CA–JV 96–0053.

Court of Appeals of Arizona,
Division 1, Department A.

May 15, 1997.

Michael E. Kranitz, Phoenix, for Appellant Father.

Michael D. Hintze & Assoc., Ltd. by Michael D. Hintze, Richard Douglas Dault, Phoenix, and Laura E. Lowery, Phoenix, Guardians ad litem for Child.

Grant Woods, Attorney General by Susan Frank, Assistant Attorney General, Virginia Richter, Assistant Attorney General, Phoenix, for Appellee ADES.

Lon S. Taubman, Phoenix, for Maternal Grandparents.

Stephen J. Green, Phoenix, for Mother.

## OPINION

GRANT, Judge.

This case involves a private dependency petition filed by the six-year-old child's maternal grandparents on January 19, 1995. At a Review of Temporary Custody Hearing on February 13, 1995, the juvenile court refused to return physical custody of the child to the father while the dependency proceeded. The Arizona Department of Economic Security Child Protective Service ("C.P.S.") was joined as a co-petitioner at the conclusion of the temporary hearing. After a six-day trial,

the court found the child to be dependent as to the father and ordered the child to be placed out of the home, granting custody to the maternal grandparents. The father timely appealed the juvenile court's dependency ruling and its order of out-of-home placement. For the reasons that follow, we affirm.

## FACTS AND PROCEDURAL HISTORY

On March 6, 1995, the court held a pre-trial conference as to the father, and scheduled a trial for May 15 through 18, 1995. On April 26, 1995, a pre-trial conference was held as to the mother and the child was found dependent as to the mother. The father filed a Motion to Continue the Contested Dependency Hearing because he was unable to complete interviewing potential witnesses and could not attend the trial in May. The court granted the father's motion to continue and allowed him to complete discovery.

The hearing was held from August 21 to 24, 1995, and continued on December 19 and 20, 1995. Extensive testimony was presented in the six-day hearing. The court admitted caseworker reports into evidence over the father's hearsay objection. On January 4, 1996, the court found the child dependent as to her father. The father timely appealed. On March 7, 1996, the father filed his Statement of Grounds of Appeal and Memorandum of Points and Authorities. On July 22, 1996, the father filed a supplemental brief.

This action stems from a violent altercation between the father and his girlfriend while the child was in the home. After the altercation, a friend of the father placed the child with the maternal grandparents. After that placement, the maternal grandparents filed this action because they observed alarming behavior by the child. C.P.S. joined the maternal grandparents in this action.

The maternal grandparents previously sought custody of the child by filing a dependency petition in 1991, but that action was consolidated with a related domestic relations case between the mother and father. At the time this action was filed, the father had custody of the child and the mother had visitation rights. Visitation for the mother would normally occur at the maternal grandparents' home. Just prior to the filing of the petition in this action, the mother was jailed on charges of allegedly participating in a murder. In this action the mother does not contest the placement with the maternal grandparents.

The petition alleged and the juvenile court testimony related to an incident of domestic violence. During a dispute between the father and his girlfriend, a gun was discharged while the child was in the home. Leaving the child in the home, the father left before the police arrived. At the contested dependency trial, the father admitted that the gun discharged; however, he maintained that while threatening him his girlfriend discharged the gun. When questioned, the father admitted that he did not check on the child following the firing of the gun. He asserted, "She was still asleep this whole time, even when the police were there. I felt there was no reason to disturb her, let her know any knowledge of it happening." Later, on January 12, 1995, in front of the child and the father's girlfriend, the father threatened to kill himself and the child. After the police were called by the father's girlfriend, the father fled the residence, again leaving the child.

C.P.S. presented testimony at trial that the father's relationship with the girlfriend was volatile. According to one of the couple's acquaintances, "[The father] agreed with me that they had a problem, that they fought all the time." The paternal grandfather also testified that the father and his girlfriend had a verbally and physically abusive relationship. The father and the girlfriend had obtained restraining orders against one another before the filing of this dependency petition.

Following the altercation on January 12, 1995, the father went to the residence of a friend. There, the father made physical threats toward his girlfriend. The friend testified:

And so we went into the house and he started telling me that he was going to die that night and that he was going to kill his girlfriend ... and cut her breast implants

and go back to the house and call the police and tell the police what he had just done. And when the police showed up he was going to rush at the police and make the police shoot him so that he could die that night.

The father left the friend's home, but later called the friend and told her that he had taken an overdose of pills. The friend then called 911 to report a suicide attempt and to make arrangements to place the child with the maternal grandparents.

The juvenile court heard expert testimony from the child's evaluating psychologist, the child's therapist, the child's counselor, and a psychologist who interviewed the father. All mental health professionals expressed the opinion that the child had been emotionally abused and that out-of-home placement was warranted. The child's evaluating psychologist, Dr. Hollenbeek, Ph.D, diagnosed the child as suffering from adjustment disorder with depressed mood and concluded that she had an internalized pervasive fear because of her father's aggressive and volatile behavior. He testified that during his evaluation session with the child, she was upset and despondent and she told him that her father had threatened to kill his girlfriend and another individual. Dr. Hollenbeek testified about the results of his interview with the child as follows:

[S]he felt like running when she was at her father's house. She made reference to stating that he's not very nice. She indicated to me that dad has two guns he shoots bad people with. She was afraid. She felt he was mean.... What I did believe very strongly was that ... this is a child who was in fact very fearful of the father at the time.... [T]his still is a child who had a significant degree of emotional fear.... [T]o place the child back in that situation without resolving it would only increase that level of fear that the child was experiencing [and] in a sense that's almost tormenting the child in my belief.

According to the child's counselor, Dr. Robbie Adler–Tapia, her distress and accompanying behaviors were significant enough for diagnosis. He testified that "she did display enough symptomatology for an adjustment disorder and that diagnosis in a child that age is a grave concern for me. It can cause consistent and life-long problems."

Dr. Henley, a psychologist who interviewed the father, diagnosed him as suffering from a "personality disorder." He recommended out-of-home placement for the child. Dr. Henley determined that the child would be at risk if she were returned to the father. He stated that the father

[n]eeded to gain a better understanding of himself, his moods, his conflict, his tendency to deny his participation in dysfunctional relationships. To try to bring some order to that, some insight into that, because if the child is going to remain in his care, he needed to protect her from the fruits of what might be some of his difficult or unresolved behaviors.

The D.E.S. caseworker who administered the case at the time of the hearing testified that she concurred with the child's therapist that the child would require further psychotherapy to address her ongoing fears. In the caseworker's opinion, if the father had custody, he would not ensure that the child attended psychotherapy sessions because the father did not agree that the child needed to deal with her fears caused by his previous aggression. Therefore, the caseworker also recommended an out-of-home placement for the child. Finally, the caseworker testified that between the time the maternal grandparents were granted temporary custody of the child, and the time of the trial, the father had suicidal ideations and had missed both urinalyses and counseling sessions required by the D.E.S. case plan.

The father's previous caseworker, who had moved out-of-state, was presented by the state for cross-examination. The father's attorney cross-examined him telephonically. That caseworker testified that the father refused to participate in drug rehabilitation which had been ordered and that he did not comply with the urinalyses required by the C.P.S. case plan.

The intake caseworker was also contacted by the Arizona Department of Health Services ("D.H.S."), which had received an inde-

388

pendent complaint about the father holding a day care license. The complainant informed D.H.S. that the father had acted inappropriately with the children in his day care. D.H.S. petitioned to revoke the father's day care license. The intake caseworker also testified that her investigation revealed that the father had abused drugs throughout his life and she therefore required drug rehabilitation in the case plan.

The intake caseworker interviewed the child one week after receiving the referral from the maternal grandmother. The child's statements to the caseworker made it clear that the child was fearful of her father. The caseworker testified that the child told her that her father had threatened suicide in front of her and that he and his girlfriend fought excessively. The child also told the caseworker that her father had two guns, that she had seen him take pills and "act silly," that she was rarely fed while in his care, and that she was afraid. The caseworker's report recounted the following narrative from the child:

> My dad was sick ... and [he] said, "hurry and get dressed," not to go to Cora's [the girlfriend's] because he doesn't want to go to jail ... he didn't say that, but I know he thought he was going to go to jail. We went to Sara's [the father's friend] ... and she called my grandma because I had on the same clothes for the fourth day. I heard my dad say he was going to kill himself in the backyard at Cora's.... He has two rifles ... I don't want to go back to my Daddy.

After receiving all of the above evidence, the juvenile court denied the father's request to have custody of the child and found the child dependent pursuant to Arizona Revised Statutes Annotated ("A.R.S.") section 8–201(11). The court ordered an out-of-home placement for the child, released her to the custody of her maternal grandparents, and ordered the Foster Care Review Board to review the placement every six months.

This court has jurisdiction of this appeal pursuant to A.R.S. section 8–236 and Rule 24 of the Arizona Rules of Procedure for the Juvenile Court.

**ISSUES**

The following issues are presented in this appeal:

I. Did the juvenile court's admission of the caseworker reports pursuant to Rule 16.1(f) of the Arizona Rules of Procedure for the Juvenile Court violate the father's due process and equal protection rights under the Arizona and United States Constitutions?

II. Was there sufficient evidence to support the juvenile court's finding that the child was dependent and needed out-of-home placement?

**DISCUSSION**

**I. Admission of the Caseworker Reports**

The father maintains that the juvenile court erred in admitting the C.P.S. caseworker reports. He argues the admission of those reports over his objection, without first redacting hearsay statements, violated his rights to due process and equal protection under the Fifth and Fourteenth Amendments to the United States Constitution and Article 2, sections 4 and 13 of the Arizona Constitution. We first address the evidentiary issue and then address the constitutional claim.

*A. The Evidentiary Rulings*

■ Generally, in dependency proceedings, the decision of the juvenile court as to the weight and effect of evidence will not be disturbed unless it is clearly erroneous. *In re Appeal in Maricopa County, Juvenile Action No. J–75482*, 111 Ariz. 588, 591, 536 P.2d 197, 200 (1975). The juvenile court admitted the caseworker reports pursuant to Rule 16.1 of the Arizona Rules of Procedure for the Juvenile Court. The father's counsel objected to the admission of the reports, stating:

> We had an ongoing objection referred to in our initial list of witnesses in which we objected to any hearsay statements coming in by way of court reports. The reports are full of hearsay statements which would not allow the respondent father to cross-examine the parties. We have tried to

make that very clear to everybody by filing and referring to that in our list of witnesses....

The state maintains that the father has waived his right to appeal the admission of the caseworker reports which contain statements by the father's girlfriend, other witnesses and by the child. The only basis for the father's hearsay objection in the father's list of witnesses and exhibits is an objection to child hearsay offered pursuant to Rule 803(24) of the Arizona Rules of Evidence or A.R.S. section 8–238, which provides for a hearsay exception as to a minor's statements regarding acts of abuse or neglect perpetrated against him or her. Here, no specific objection was made to other hearsay contained in the reports in the father's list of witnesses and exhibits. However, after the father's counsel made the above objection at the hearing, the following exchange ensued:

> [Counsel for the state]: Your Honor, there's nothing in ... [Rule 16.1] that states regarding any objections. It specifically states that it's an exception to hearsay rule.... [Counsel for the father] ... will have the opportunity to call any of the witnesses that he would wish to.
>
> The Court: The reports will be admitted pursuant to the cited rules.
>
> [Counsel for the father]: Please note an ongoing objection in reference to that, your Honor.
>
> The Court: Absolutely.

Although the father preserved his objection to the hearsay statements in the reports, the objection is ill-founded. Rule 16.1 of the Arizona Rules of Procedure for the Juvenile Court covers general rules for dependency hearings in juvenile court and states:

> (f) **Evidence.** Prior to any dependency hearing, the court may examine the Department of Economic Security's written reports and make the same available to all parties and their counsel prior to the hearing. At any dependency hearing, the court *shall* admit the Department of Economic Security's written reports into evidence as long as the reports have been provided to all parties at least 30 days prior to the hearing and the caseworker who prepared

the report is available to be cross-examined.

(Emphasis added.) Furthermore, the notes to the 1993 amendment to Rule 16.1(f) explain:

> Paragraph (f) incorporates and clarifies language from former Rule 16(a). That rule was based upon A.R.S. section 8–546.01(C)(7) which requires submission of an investigatory report by CPS to the court prior to dependency hearings. There has traditionally been confusion over whether Rule 16(a) constituted an exception to the hearsay rule or only a rule of procedure. The amendment clarifies that the rule is both. The report may be examined by the court pursuant to the statute and, if the matter is contested, it will be taken into evidence only if appropriate notice is given and an opportunity to cross examine the author of the report and to subpoena the persons whose statements are reported in the report is provided.

Thus, Rule 16.1(f) provides that admission of caseworker reports is mandatory if two conditions are met: (1) the reports have been provided to all the parties at least 30 days prior to the hearing; and (2) the caseworker who prepared the report is available for cross-examination. Here, the report was provided more than thirty days prior to the hearing and three C.P.S. caseworkers who authored the reports were cross-examined by the father's attorney. Therefore, the caseworker reports were properly admitted.

■ The language, "available to be cross-examined," in Rule 16.1(f) implies an affirmative duty on the part of C.P.S. to make the caseworker available at the time of trial. The note states that the rule is intended to provide the litigants with an opportunity to subpoena people other than caseworkers whose statements appear in the reports ("declarants"). Thus, the Arizona Supreme Court, which promulgated the rule, did not intend that there be an affirmative duty on the part of C.P.S. to produce every declarant quoted in C.P.S.'s reports. Otherwise, the rule would not have distinguished between the caseworkers who prepare reports and those whose statements appear in such reports.

At trial, the father did not argue that the addresses of the declarants were not provided or that the declarants could not be subpoenaed. No motions requesting such information were filed, although the father was informed that the reports would be used in the state's list of witnesses and exhibits. C.P.S.'s written reports were provided to the father thirty days before the hearing. The state's list of witnesses and exhibits stated that the state would call two intake caseworkers who would "... testify to the allegations of dependency, the filing of the petition and *the matters contained in the court reports*" (emphasis added). The state's list of witnesses and exhibits also states that the state would be calling the caseworker overseeing the case at the time of trial to testify to "matters contained in the court reports," among other relevant subjects. Finally, in its list of exhibits, the state listed "all caseworker reports." Therefore, the father had adequate notice that the state intended to introduce the caseworkers' reports. Furthermore, he was granted an extension by the court to complete discovery, and he had ample time to interview the declarants.

The father has the responsibility of producing his own witnesses. There was no evidence that C.P.S. refused to provide information to the father. The father made no showing that he was unable to locate the persons whose testimony to which he now objects. There was brief testimony that he asked C.P.S. to provide him with the address or telephone number of his former girlfriend. However, there was no evidence that C.P.S. had the information but refused to provide it. The father cannot raise those objections for the first time on appeal. *Torres v. North Am. Van Lines, Inc.*, 135 Ariz. 35, 39, 658 P.2d 835, 839 (App.1982).

Finally, the father objected to the hearsay statements made by the child which were in the caseworker notes. A.R.S. section 8–238 provides for the admission of out-of-court statements made by the child in a dependency proceeding. *See In Matter of Appeal in Maricopa County Juvenile Action No. JS–7499*, 163 Ariz. 153, 157, 786 P.2d 1004, 1008 (App.1989); *Juvenile Action No. J–75482*, 111 Ariz. at 592, 536 P.2d at 201

(The use of child guidance reports in dependency proceedings did not present Sixth Amendment confrontation problems since dependency proceedings are civil in nature.). Therefore, the juvenile court properly admitted the caseworker reports.

### B. Due Process Issues

We next address the father's claim that the admission of the caseworker reports violated his rights to due process and equal protection under the Arizona and United States Constitutions.

As discussed above, Rule 16.1 provides a party in a dependency action an opportunity to subpoena and interview declarants in the caseworker reports and other C.P.S. records, and mandates that the author of such reports be available for cross-examination. Both of those elements ensure that a parent's due process rights are protected. *See In Matter of Appeal in Maricopa County Juvenile Action No. JS–501904*, 180 Ariz. 348, 884 P.2d 234 (App.1994) (In a parental termination proceeding, due process requires that notice be reasonably calculated, under all circumstances, to apprise the interested parties of the pendency of an action and to afford them an opportunity to present their objections.).

We previously held that in severance actions, when any party timely, specifically, and properly objects to portions of a social study report, such portions of that report are not admissible into evidence and the state must prove its case with other evidence. *Arizona Dep't of Econ. Sec. v. Superior Court*, 181 Ariz. 469, 471, 891 P.2d 936, 938 (App.1994). However, in parental severance proceedings, the admissibility of social study reports is governed by A.R.S. section 8–537(B), which provides in part: "The court *may* consider any and all reports required by this article and such reports are admissible into evidence *without objection.*" (Emphasis added.)

In dependency proceedings such as this one, however, caseworker reports are admitted into evidence pursuant to Rule 16.1(f) of the Arizona Rules of Procedure for the Juvenile Courts which states, "At any dependency hearing, the court *shall* admit the Department of Economic Security's writ-

ten reports into evidence as long as the reports have been provided to all parties at least 30 days prior to the hearing and the caseworker who prepared the report is available to be cross-examined." (Emphasis added.) Rule 16.1(f) is mandatory; therefore the court was required to admit the caseworker reports because all conditions of this rule had been met.

In *Juvenile Action No. J–75482*, the court held that if counsel for any party in a dependency proceeding objects to any material in the report being considered by the trial court, *such material may not be considered.* 111 Ariz. at 593, 536 P.2d at 202 (emphasis added). However, that case preceded the promulgation of Rule 16.1(f). Here, while C.P.S. did not redact the portions of the reports which were the subject of the father's objections, it complied with Rule 16.1(f) by presenting the caseworkers who authored the report for cross-examination, and also provided the report to the father thirty days before the hearing. Therefore, the father's due process rights were protected.

In *Juvenile Action No. JS–501904*, the court held that A.R.S. section 8–537(B) provides a "reasonable and workable" supplement to the Rules of Evidence. 180 Ariz. at 353, 884 P.2d at 239. We hold that Rule 16.1(f), which mandates that caseworker reports be provided at least thirty days prior to the hearing and that the author be subject to cross-examination, also constitutes a "reasonable and workable" supplement to the Rules of Evidence.

In *Juvenile Action No. JS–501904*, we declined to hold that in a parental termination proceeding a court must disregard an entire social study report if a party objects to the report in its entirety. 180 Ariz. at 354, 884 P.2d at 240. We also refused to read *Juvenile Action J–75482* so broadly that it would require preclusion of a caseworker report as a whole where a party objected to its admission. *Id.* Such a holding, we noted, would effectively eliminate the consideration of the reports in severance proceedings which are required by A.R.S. section 8–537 by allowing any party to prevent the court from considering a social study report merely by objecting to the report as a whole without stating a specific basis for objection. *Id.* We noted that those reports provide helpful information not only for C.P.S., but also for the juvenile court and for the parents. *Id.* We also stated, "if counsel for any party objects to *any material in the report* being considered by the trial court, *such material* may not be considered." *Id.* (citation omitted) (emphasis added.) Finally, we stated that in *Juvenile Action No. J–75482*, the supreme court held that the juvenile court did not violate the mother's due process rights when it considered the redacted social study report. *Id.* Similarly, in this case, we hold that the father's due process rights were not violated by the admission of the caseworker reports.

### C. Equal Protection

The father did not clearly articulate his argument that admission of the caseworker reports violated his right to equal protection under the Fourteenth Amendment to the United States Constitution, and Article 2, Section 13 of the Arizona Constitution.

The due process clause protects liberty and property interests, while the equal protection clause protects against discriminatory classifications. *Church v. Rawson Drug & Sundry Co.*, 173 Ariz. 342, 348, 842 P.2d 1355, 1361 (App.1992) (A statute abolishing joint and several liability did not violate the equal protection rights of the injured plaintiffs.). Courts have recognized that conceptually, the review of equal protection claims and due process claims is similar. *Id.* (citing *Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 93, 98 S.Ct. 2620, 2640–41, 57 L.Ed.2d 595 (1978)). The caseworker reports in issue were admitted pursuant to Rule 16.1(f). Rule 16.1(f) was promulgated pursuant to A.R.S. section 8–546.01(C)(7) which requires submission of an investigatory report by C.P.S. to the juvenile court at least 48 hours prior to dependency hearings. *See* Ariz. R.P. Juv. Ct. 16.1, Comment to 1993 Amendment.

A parent's right to custody and control of his or her children is a fundamental interest guaranteed by the United States and Arizona Constitutions. *In Matter of Ap-*

*peal in Maricopa County, Juvenile Action No. JS–9104,* 183 Ariz. 455, 461, 904 P.2d 1279, 1285 (App.1995). However, that right is not absolute; the state may remove a child from a parent's custody if the child is threatened with immediate or apparent harm or danger. *Nation v. Colla,* 173 Ariz. 245, 253, 841 P.2d 1370, 1378 (App.1991).

Because Rule 16.1(f) affects a fundamental right, the appropriate standard to apply in analyzing the rule is the strict scrutiny test. *Bryant v. Continental Conveyor & Equip. Co.,* 156 Ariz. 193, 196, 751 P.2d 509, 512 (1988). When strict scrutiny applies, the statute in question must serve a compelling state interest and the regulation must be necessary to achieve the legislative objective. *Kenyon v. Hammer,* 142 Ariz. 69, 78, 688 P.2d 961, 970 (1984).

Here, the state and its citizens have a compelling state interest in ensuring that all children in Arizona are provided with appropriate care and are free from parental abuse or neglect. The introduction of C.P.S. caseworker reports furthers that interest and is necessary to the adjudication of a dependency proceeding. As discussed above, in *Juvenile Action No. JS–501904,* this court noted that caseworker reports provide helpful information not only for C.P.S., but also for the juvenile court and for the parents. 180 Ariz. at 354, 884 P.2d at 240. The safeguards of Rule 16.1(f), discussed above, ensure that the parent is provided with equal protection and due process.

## II. Evidence Supporting the Finding of Dependency

Finally, the father maintains that the juvenile court erred by adjudicating the child dependent and by not returning the child to him. Appellate courts will not set aside a juvenile court's ruling in a dependency action unless there is no reasonable evidence to support its findings. *Juvenile Action No. JS–501904,* 180 Ariz. at 352, 884 P.2d at 238 (citation omitted). The father's claim is based upon his arguments concerning the admission of the hearsay statements in the caseworker reports. However, as we discussed above, the juvenile court properly admitted those reports. As is evident from our discussion of the facts, there is a plethora of evidence supporting the juvenile court's ruling. The professional recommendations and the case history, as reported by the child, provide a factual history sufficient to support the juvenile court's finding of dependency. The father behaved erratically and was involved in emotionally and physically violent relationships. While she was in the father's care, the six-year-old child was placed in exceedingly dangerous situations and was exposed to emotional cruelty. The violence was significant enough to cause the child to be anxious and to fear her father. Because the evidence as a whole supports the juvenile court's ruling, we affirm the ruling.

## CONCLUSION

The admission of the caseworker reports was proper because the requirements of Rule 16.1(f) of the Rules of Procedure for the Juvenile Court were met. In addition, the father's rights to due process and equal protection were not infringed. Finally, the evidence as a whole supported the juvenile court's ruling. We therefore affirm.

TOCI and RYAN, JJ., concur.